1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   TYSHEIKA OGBUEHI,                          No. 2:13-cv-00672-KJM-KJN

12                   Plaintiff,

13          v.                                   ORDER

14   COMCAST OF
     CALIFORNIA/COLORADO/FLORIDA/
15   OREGON, INC.,

16                   Defendant.

17

18          This matter is before the court on the unopposed motion by Tysheika Ogbuehi

19   ("plaintiff" or "class representative") for final approval of class action settlement.  (ECF No. 28.)

20   Also before the court is plaintiff's unopposed motion for attorney's fees and costs.  (ECF No. 25.)

21   The court held a hearing on the matter on March 13, 2015, at which David Spivak appeared for

22   plaintiff and Daryl S. Landy appeared for defendant.  As explained below, the court GRANTS

23   plaintiff's motions.

24   I.     FACTUAL AND PROCEDURAL BACKGROUND

25          This class action lawsuit arises out of the alleged failure of Comcast Cable

26   Communications Management, LLC (incorrectly named as Comcast of California/Colorado/

27   Florida/Oregon, Inc.) ("defendant") to properly compensate plaintiff and other employees under

28   the Fair Labor Standards Act ("FLSA"), the California Labor Code, California Industrial Welfare

1

1    Commission order provisions and the California Business and Professions Code.  (*See generally*

2    Second Am. Compl. ("SAC"), ECF No. 16.)

3    　　　　　The second amended complaint is the operative complaint and alleges as follows.

4    Plaintiff and other similarly situated employees were employed with defendant in the position of

5    Virtual Customer Account Executive.  (*Id.* ¶ 4, ECF No. 16.)  In this position, the employees

6    primarily worked from home.  (*Id.*)  Defendant classified plaintiff and other Virtual Customer

7    Account Executives as non-exempt, hourly employees.  (*Id.* ¶ 11.)  Plaintiff and other employees

8    worked more than eight hours in a day and more than forty hours in a workweek, but defendant

9    failed to pay them overtime wages.  (*Id.*)  Defendant also required Virtual Customer Account

10   Executives to work "off the clock" but did not pay them for this work.  (*Id.*)  Plaintiff brings nine

11   separate claims for relief: (1) failure to indemnify in violation of the California Labor Code;

12   (2) failure to provide meal periods in violation of the California Labor Code; (3) failure to

13   provide rest periods in violation of the California Labor Code; (4) failure to pay wages in

14   violation of the FLSA; (5) failure to pay employees minimum and overtime wages for all hours

15   worked in violation of the California Labor Code; (6) failure to pay waiting time penalties in

16   violation of the California Labor Code; (7) failure to provide accurate written wage statements in

17   violation of the California Labor Code; (8) unfair competition under the California Business &

18   Professions Code; and (9) recovery of civil penalties under the California Labor Code.  (*Id.* at 10–

19   26.)

20   　　　　　On July 11, 2014, following the parties' participation in private mediation,

21   plaintiff filed a motion for preliminary approval of class action settlement.  (ECF No. 21.)  In

22   granting plaintiff's motion for preliminary approval of the class settlement agreement, the court

23   conditionally certified the following class:

24   　　　　　[A]ll persons employed by Comcast in the State of California from
　　　　　February 26, 2009 through and including the implementation of the
25   　　　　　California Call Center Closure [on November 30, 2012], who held
　　　　　positions as Virtual Customer Account Executives, and were not
26   　　　　　paid a severance payment that was offered as a result of the
　　　　　California Call Center Closure. The Class includes the estates of
27   　　　　　such persons and, if any such person is incompetent or deceased,

28

1      the legal representative or successor in interest as evidenced by

2  reasonable verification.

3 (ECF No. 24 at 24.)

4     The court's preliminary approval was with reservations, however.  First, the court

5 was concerned with the 33.33 percent attorney's fee request of plaintiff's counsel.  (ECF No. 24

6 at 17.)  That is because "the benchmark for such an award is 25 percent, the settlement was

7 reached during an early stage of litigation, and . . . counsel has a 'clear sailing' agreement with

8 defendant." (*Id.*)  Therefore, the court asked plaintiff's counsel to "provide the court with the

9 information to permit the court to perform a lodestar cross-check." (ECF No. 24 at 17.)  To allow

10 the court to conduct a lodestar cross-check, the court asked plaintiff's counsel to provide a

11 "detailed description of each task completed, the number of hours spent on each task, when the

12 work was completed, who performed the work, each person's hourly rate and the total number of

13 hours worked." (*Id.*)

14     Second, with respect to plaintiff's request for an enhancement award, the court

15 noted that class counsel's generalized summary of the services plaintiff provided was not

16 sufficient "to enable the court to make a well-informed decision regarding approval of plaintiff's

17 proposed enhancement award." (*Id.* at 18–19.)  Accordingly, the court asked plaintiff to "provide

18 a detailed declaration describing her current employment status, any risks she faced as class

19 representative, specific activities she performed as class representative and the amount of time

20 she spent on each activity." (*Id.* at 19.)  At the hearing on the instant motion, the parties

21 represented plaintiff is gainfully employed.

22     Third, with respect to the parties' negotiations, the court asked the parties for

23 information relating to their mediation to assess the settlement's reasonableness.  (*Id.* at 19–20.)

24 Specifically, the court required the parties to "provide information exchanged during their private

25 mediation including, but not limited to, mediation statements and any relevant communications

26 during the parties' negotiations." (*Id.* at 20.)

27 /////

28

1   Finally, with respect to the *cy pres* provision of the settlement agreement, the court

2   noted that it would require the parties to address the appropriateness of that provision at the final

3   hearing.  (*Id.* at 21.)

4   On December 1, 2014, plaintiff filed a motion for attorney's fees (ECF No. 25),

5   and on February 28, 2015, plaintiff filed a motion for final approval of class action settlement

6   (ECF No. 28).  Defendant filed a brief in support of plaintiff's motion for final approval of class

7   action settlement.  (ECF No. 26.)  Finally, the parties have lodged certain documents with the

8   court for *in camera* review.  (ECF No. 27.)

9   II.   THE KEY TERMS OF THE SETTLEMENT AGREEMENT

10   Under the settlement agreement, defendant has agreed to pay a gross settlement

11   amount ("GSA") of $100,000.  (ECF No. 24 at 10.)  The GSA includes class counsel's attorney's

12   fees, litigation expenses, claims administration costs, the Private Attorney General Act ("PAGA")

13   penalty payment, settlement payments to class members, and the enhancement award.  (ECF

14   No. 21-2 ¶ 2.17.)  The GSA does not include defendant's share of payroll taxes.  (*Id.*)  By the

15   instant motion, the parties seek the court's approval of the following terms of the settlement

16   agreement.  The GSA of $100,000 is to be distributed as follows:

17   1.  The amount to be paid to the class representative is $5,000;

18   2.  The amount to be paid for class counsel fees is $33,333;

19   3.  The amount to be paid for litigation expenses is $8,004.69;

20   4.  The PAGA payment is $2,500, of which $1,875 will go to the California Labor

21   and Workforce Development Agency ("LWDA"), and the $625 balance will be

22   distributed to the class members on a pro rata basis; and

23   5.  The amount to be paid to the class administrator is $5,000.

24   (ECF No. 28-1 at 1–2.)

25   Plaintiff further seeks the court's approval of the appointment of plaintiff as class

26   representative, the appointment of David Spivak of The Spivak Law Firm and Walter Haines of

27   the United Employees Law Group as class counsel, and the appointment of Gilardi & Co., LLC as

28   class administrator.  (*Id.* at 1.)  After deducting the above distributions from the GSA ($100,000 –

4

1   $53,212.69), the net settlement amount available to the class members is $46,787.31.

2          After the claim administrator mailed the notice packets to the participating class

3   members, it received neither objections nor requests to opt-out.  At the hearing, the parties

4   confirmed that no objections or opt-out requests were received.

5   III.    CLASS CERTIFICATION

6          A party seeking to certify a class must demonstrate that it has met the requirements

7   of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b).

8   *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *Ellis v. Costco Wholesale Corp.*, 657

9   F.3d 970, 979–80 (9th Cir. 2011).  Although the parties have stipulated that a class exists for

10  purposes of settlement, the court must nevertheless undertake the Rule 23 inquiry independently.

11  *West v. Circle K Stores, Inc.*, No. 04-0438, 2006 WL 1652598, at *2 (E.D. Cal. June 13, 2006).

12         Under Rule 23(a), before certifying a class, the court must be satisfied that:

13         (1) the class is so numerous that joinder of all members is
14         impracticable (the "numerosity" requirement);

15         (2) there are questions of law or fact common to the class (the
            "commonality" requirement);

16         (3) the claims or defenses of representative parties are typical of the
17         claims or defenses of the class (the "typicality" requirement); and

18         (4) the representative parties will fairly and adequately protect the
            interests of the class (the "adequacy of representation" inquiry).

19  *Collins v. Cargill Meat Solutions Corp.*, 274 F.R.D. 294, 300 (E.D. Cal. 2011) (quoting *In re Itel

20  Secs. Litig.*, 89 F.R.D. 104, 112 (N.D. Cal. 1981)); *accord* FED. R. CIV. P. 23(a).

21         The court must also determine whether the proposed class satisfies Rule 23(b)(3),

22  on which plaintiff relies in this action.  To meet the requirements of that subdivision of the rule,

23  the court must find that "'questions of law or fact common to class members predominate over

24  any questions affecting only individual members, and that a class action is superior to other

25  available methods for fairly and effectively adjudicating the controversy.'"  *Wal-Mart Stores, Inc.

26  v. Dukes*, ___ U.S. ___, ___, 131 S. Ct. 2541, 2558 (2011) (quoting FED. R. CIV. P. 23(b)(3)).

27  "The matters pertinent to these findings include: (A) the class members' interests in individually

28  controlling the prosecution or defense of separate actions; [and] (B) the extent and nature of any

5

1  litigation concerning the controversy already begun by or against class members . . . ."  FED. R.

2  CIV. P. 23(b)(3)(A)–(B).

3         Here, as noted above, plaintiff filed a motion, which the court granted, for

4  preliminary certification of the following class:

> [A]ll persons employed by Comcast in the State of California from
> February 26, 2009 through and including the implementation of the
> California Call Center Closure [on November 30, 2012], who held
> positions as Virtual Customer Account Executives, and were not
> paid a severance payment that was offered as a result of the
> California Call Center Closure. The Class includes the estates of
> such persons and, if any such person is incompetent or deceased,
> the legal representative or successor in interest as evidenced by
> reasonable verification.

11  (ECF No. 24 at 24.)

12         There has been no objection to certification of the class, and nothing before the

13  court suggests the preliminary certification was improper.  Hence, for the same reasons as set

14  forth in the court's preliminary approval order (*id.* at 4–10), the court finds certification of the

15  class appropriate for the purpose of the final approval of the settlement agreement.

16  IV.   NOTICE TO AND RESPONSE FROM THE CLASS MEMBERS

17         The number of potential class members in this action is eighty-eight.  (ECF No. 24

18  at 5.)  On October 24, 2014, the class administrator mailed the class notices and the claim forms

19  to the eighty-eight class members.  (ECF No. 28-3 ¶ 4.)  The claims administrator received only

20  one returned notice with a forwarding address, which it immediately mailed to the forwarding

21  address the United States Postal Services ("USPS") provided.  (*Id.* ¶ 5.)  The claims administrator

22  has also received nine undeliverable notices.  (*Id.* ¶ 6.)  Through an address search, the claims

23  administrator found updated addresses for seven of those nine.  (*Id.*)  It re-mailed the packets to

24  those seven addresses; it also re-mailed packets to the two addresses for which it was unable to

25  locate updated addresses.  (*Id.*)  Following the re-mailing, "five were returned once again as

26  undeliverable."  (*Id.*)  At the hearing on the instant motion, the parties agreed that a total of five

27  undeliverable packets was an acceptable number.  In addition, the class administrator established

28  a toll-free telephone number, enabling the class members to inquire about the settlement.  (*Id.* ¶

7.) That number was provided on the notice sent to the class members. (*Id.*) The call center system at the other end of that toll-free number has English and Spanish speaking live operators, who "are available Monday through Friday between the hours of 7:00 a.m. and 5:00 p.m." (*Id.*)

The claims period closed on December 11, 2014. (*Id.* ¶ 9.) As of that date, there were no objections to the settlement and no requests to opt out of the settlement. (*Id.* ¶¶ 9–10.) At hearing, the parties confirmed that no other packets were returned as undeliverable and no opt-out forms or objections were received after December 11, 2014.

V.    THE SETTLEMENT AND FAIRNESS

A.    Legal Framework

When parties settle a class action, a court cannot simply accept the parties' resolution; rather it must also satisfy itself the proposed settlement is "fundamentally fair, adequate, and reasonable." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). After the initial certification and notice to the class, a court conducts a fairness hearing before finally approving any proposed settlement. *Narouz v. Charter Commc'ns, Inc.*, 591 F.3d 1261, 1267 (9th Cir. 2010); FED. R. CIV. P. 23(e)(2) ("If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate."). A court must balance a number of factors in determining whether a proposed settlement is in fact fair, adequate and reasonable:

> [(1)] the strength of the plaintiffs' case; [(2)] the risk, expense, complexity, and likely duration of further litigation; [(3)] the risk of maintaining class action status throughout the trial; [(4)] the amount offered in settlement; [(5)] the extent of discovery completed and the stage of the proceedings; [(6)] the experience and views of counsel; [(7)] the presence of a governmental participant; and [(8)] the reaction of the class members to the proposed settlement.

*Hanlon*, 150 F.3d at 1026; *Adoma v. Univ. of Phx.*, 913 F. Supp. 2d 964, 974–75 (E.D. Cal. 2012). The list is not exhaustive, and the factors may be applied differently in different circumstances. *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982).

The court must consider the settlement as a whole, rather than its component parts, in evaluating fairness; the settlement "must stand or fall in its entirety." *Hanlon*, 150 F.3d at

1    1026.  Ultimately, the court must reach "a reasoned judgment that the agreement is not the

2    product of fraud or overreaching by, or collusion between, the negotiating parties, and that the

3    settlement, taken as a whole, is fair, reasonable and adequate to all concerned."  *Officers for*

4    *Justice*, 688 F.2d at 625.

5        B.    The Strength of Plaintiff's Case

6            When assessing the strength of plaintiff's case, the court does not reach "any

7    ultimate conclusions regarding the contested issues of fact and law that underlie the merits of

8    [the] litigation."  *In re Wash. Pub. Power Supply Sys. Secs. Litig.*, 720 F. Supp. 1379, 1388

9    (D. Ariz. 1989).  The court cannot reach such a conclusion because evidence has not been fully

10   presented and the "settlements were induced in large part by the very uncertainty as to what the

11   outcome would be, had litigation continued."  *Id.*  Instead, the court is to "evaluate objectively the

12   strengths and weaknesses inherent in the litigation and the impact of those considerations on the

13   parties' decisions to reach these agreements."  *Id.*

14           Here, "[m]uch of what led to [p]laintiff's devaluation of the lawsuit came to her

15   attention at mediation."  (ECF No. 28-1 at 6–7.)  Specifically, plaintiff took, among other things,

16   the following issues and risks into account when negotiating with defendant and concluded the

17   settlement amount was reasonable:

18           Defendant informed Plaintiff at the mediation that leading up to and
             during the California Call Center Closure, Defendant offered its
19           Virtual CAEs a severance payment in exchange for a release of all
             claims against Defendant. . . . Of the 294 potential Class
20           Members, 88 did not sign releases and did not receive a severance
             payment. . . . Defendant also reminded Plaintiff at mediation that it
21           had reimbursed her for mileage she had incurred. . . . Additionally,
             based on Defendant's disclosures, Plaintiff learned at the mediation
22           that the actionable time period for the remaining 88 Class Members
             is limited to a period of only 28 months . . . .[1]
23

24

25   (ECF No. 28-1 at 7; ECF No. 28-2 ¶¶ 13–15.)

26   _____

         [1]  The 28 month limitation was a result of a related wage and hour class action involving
27   defendant and individuals employed as Customer Account Executives, including Virtual
     Customer Account Executives, at defendant's California call centers.  (ECF No. 28-1 at 7 & n.3
28   (referencing class action *Blouin v. Comcast Corp.*, Case No. 3:08-cv-04787-MEJ (N.D. Cal.).)

1    The court agrees that in light of the uncertainties of litigating this case, an

2   immediate benefit to the purported class members is in their interest.  *See Officers for Justice*, 688

3   F.2d at 625 (noting that "voluntary conciliation and settlement are the preferred means of dispute

4   resolution").

5    This factor favors approving the settlement.

6   C.    The Risk, Expense, Complexity and Likely Duration of Further Litigation;
         The Risk of Maintaining Class Status

7

8    "Approval of settlement is 'preferable to lengthy and expensive litigation with

9   uncertain results.'"  *Morales v. Stevco, Inc.*, No. 09-00704, 2011 WL 5511767, at *10 (E.D. Cal.

10  Nov. 10, 2011) (quoting *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.* (*DIRECTV*), 221

11  F.R.D. 523, 526 (C.D. Cal. 2004)).  The Ninth Circuit has explained "there is a strong judicial

12  policy that favors settlements, particularly where complex class action litigation is concerned."  *In*

13  *re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008) (citing *Class Plaintiffs v. City of*

14  *Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)).  "'[I]t must not be overlooked that voluntary

15  conciliation and settlement are the preferred means of dispute resolution.  This is especially true

16  in complex class action litigation . . . .'"  *Id.* (quoting *Officers for Justice*, 688 F.2d at 625).

17   Here, the parties agree there are significant risks associated with litigating the

18  claims in this case.  For instance, plaintiff faces the difficulty of prevailing at summary judgment,

19  certifying the class, and then prevailing on appeal.  *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d

20  948, 966 (9th Cir. 2009).  Those difficulties in turn would result in expenditure of more time and

21  resources, for all parties.  Given the high costs associated with litigating the claims at issue, and

22  the potential lengthy duration of litigation, the court finds this factor weighs in favor of approval.

23   In addition, the risk that the court may decertify the proposed class is another

24  factor the court considers.  *See id.* ("A district court may decertify a class at any time.").  While

25  plaintiff is confident certification is proper for the proposed class, plaintiff also notes that the

26  commonality requirement could be an impediment to class certification if the case were to

27  /////

28
                                                    9

1   proceed forward.  (ECF No. 28-1 at 7–8.)  Accordingly, there remains a risk in obtaining and

2   maintaining class certification in this case.

3           These factors weigh in favor of approving the settlement.

4       D.      The Amount Offered in Settlement

5           As noted above, the parties negotiated a GSA of $100,000 for a potential class of

6   eighty-eight persons.  (ECF No. 24 at 10–11.)  Associated expenses, such as class counsel fees

7   and costs, class representative fee, class administrator fee, and penalties under California law are

8   to be paid out of the GSA.  That would leave a net settlement amount available for payment to the

9   participating class members in the amount of $46,787.31.  Mr. Spivak indicates he originally

10  estimated defendant's maximum possible liability to the class members to be $443,965.03.  He

11  indicates that some of the assumptions that went into calculating this amount are "unlikely to hold

12  true for other class members."  (ECF No. 28-2 ¶ 34.)  *Cf. Officers for Justice*, 688 F.2d at 628 ("It

13  is well-settled law that a cash settlement amounting to only a fraction of the potential recovery

14  will not per se render the settlement inadequate or unfair.").  "[I]t is the very uncertainty of

15  outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual

16  settlements.  The proposed settlement is not to be judged against a hypothetical or speculative

17  measure of what might have been achieved by the negotiators."  *Id.* at 625; *see also Collins*,

18  274 F.R.D. at 302 (a court must "'consider the plaintiffs' expected recovery balanced against the

19  value of the settlement offer'" (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078,

20  1080 (N.D. Cal. 2007))); *In re Cendant Corp., Derivative Action Litig.*, 232 F. Supp. 2d 327, 336

21  (D.N.J. 2002) (approving settlement representing less than 2% of the maximum possible

22  recovery), *cited in Hopson v. Hanesbrands Inc.*, No. 08-0844, 2009 WL 928133, at *8 (N.D. Cal.

23  Apr. 3, 2009).

24          The parties claim the settlement amount was reached through compromise and the

25  amount each member will receive is significant, all things considered.  (ECF No. 28-2 at 6–7.)

26  The settlement amount weighs slightly in favor of approval in light of the uncertainties involved

27  in litigating this case.

28          On balance, the settlement amount weighs in favor of approval.

E.      The Extent of Discovery and the Stage of the Proceedings

"In the context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) (quoting *In re Chicken Antitrust Litig.*, 669 F.2d 228, 241 (5th Cir. 1982)).

Plaintiff's counsel states the parties arrived at the settlement after conducting substantial informal discovery, which included "(i) the production of Defendant's written company policies with respect to the various wage and hour issues in this case that applied to Class Members; (ii) production of Defendant's written training materials; (iii) emails; and (iv) extensive interviews with Plaintiff."  (ECF No. 21-2 ¶ 13.)  The informal discovery facilitated a review of "the relative strengths and weaknesses" of each party's respective cases and defendant's estimated exposure.  (*Id.* ¶ 33.)  Defendant further confirms that,

> In advance of an early private mediation, [it] provided substantial data to [p]laintiff, including the number of putative class members, the average hourly rate, and the number of workweeks the putative class members worked during the putative class period.  . . . During the mediation, [defendant] provided new facts and arguments to [p]laintiff, including substantial putative class size limitations based on the prior class action settlement in [a different case] and on severance agreements that a majority of putative class members signed.

(ECF No. 26 at 1.)

While it does not appear extensive discovery was conducted, the court is satisfied the discovery enabled the parties to reach a meaningful settlement agreement.

This factor weighs in favor of approving the settlement.

F.      The Experience and Views of Counsel

Class counsel have extensive experience in the area of wage-and-hour class actions.  (ECF No. 21-2 ¶¶ 19–30; ECF No. 21-3 ¶ 3.)  Defendant's counsel is also highly experienced in wage and hour class action litigation.  (ECF No. 26 at 5.)  The attorneys agree the terms of the settlement are fair and in the best interests of the settlement class.  (*Id.* at 5–6.)

11

1    Accordingly, given the experience of counsel and their views, this factor favors approving the

2    settlement.  *See Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013).

3           G.      The Reaction of the Class Members to the Proposed Settlement

4                   "It is established that the absence of a large number of objections to a proposed

5    class action settlement raises a strong presumption that the terms of a proposed class settlement

6    action are favorable to the class members."  *DIRECTV*, 221 F.R.D. at 529.

7                   At the final approval hearing, the parties confirmed that no opt-out forms or

8    objections to the proposed settlement were filed or served on counsel.  As to the notices sent to

9    the class members, only five of eighty-eight (or 5.7%) were returned as undeliverable.  This

10   factor weighs in favor of approving the settlement.  *Id.* ("The absence of a single objection to the

11   [p]roposed [s]ettlement provides further support for final approval of the [p]roposed

12   [s]ettlement."); *see Fernandez v. Victoria Secret Stores, LLC*, No. 06-04149, 2008 WL 8150856,

13   at *4 n.18 (C.D. Cal. July 21, 2008) (finding notice to more than 90% of the potential class

14   sufficient).

15          H.      The Possibility of Collusion

16                  Where the parties negotiate a settlement agreement before a formal class

17   certification, as in the instant case, the court must evaluate the settlement for evidence of

18   collusion with a "higher level of scrutiny."  *In re Bluetooth Headset Products Liab. Litig.*, 654

19   F.3d 935, 946 (9th Cir. 2011).  "Collusion may not always be evident on the face of a settlement,

20   and courts therefore must be particularly vigilant not only for explicit collusion, but also for more

21   subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain

22   class members to infect the negotiations."  *Id.* at 947.  A few such signs may include: (1) a

23   disproportionate distribution of the settlement to counsel; (2) a "clear sailing" provision, under

24   which the defendant agrees not to oppose an attorney's fee award up to a certain amount, *id.*; and

25   (3) when, as here, the class representative receives an enhancement payment that is much higher

26   than payments unnamed class members stand to receive from the settlement, *Staton v. Boeing

27   Co.*, 327 F.3d 938, 975 (9th Cir. 2003).

28   /////

Here, with respect to the first sign, the court finds the proposed distribution of the settlement to counsel is not disproportionate.  Class counsel seeks $33,333, which equates to about 33 percent of the $100,000 GSA.  As the court explains in further detail below, that amount is within the range acceptable by the Ninth Circuit.  Thus, the first sign weighs in favor of finding no collusion.  As to the second sign, while defendant agreed not to oppose class counsel's request for attorney's fees, the court finds that because those fees are to come from the settlement fund, that provision does not raise concern.  *See Rodriguez*, 563 F.3d at 961 (collusion generally inferred from a "clear sailing" provision where attorney's fees are paid on top of the settlement fund).  Moreover, the agreement provides that if the court awards less than that amount, the remaining funds will become a part of the net settlement amount and shall remain binding in the event the court does not approve any or all of the requested attorneys' fees.  (ECF No. 21-2, Ex. 1, ¶ 2.7.)  Accordingly, the second sign weighs in favor of finding no collusion.

Furthermore, the settlement agreement is the product of arms-length mediation involving experienced counsel before an experienced mediator, Mark Rudy of Rudy, Exelrod, Zieff & Lowe LLP.  (ECF No. 21-2 ¶ 14, ECF No. 26 at 1).  The parties represent that Mr. Rudy is a "respected mediator with extensive experience in wage and hour class actions . . . ."  (ECF No. 21-2 ¶ 14.)  *See Bluetooth*, 654 F.3d at 948 (the presence of a neutral mediator is a factor weighing in favor of finding of no collusion); *Villegas v. J.P. Morgan Chase & Co.*, No. 09–00261, 2012 WL 5878390, at *6 (N.D. Cal. Nov. 21, 2012) (participation in mediation "tends to support the conclusion that the settlement process was not collusive") (citation omitted).

As noted above, one of the court's reservations in preliminarily approving the settlement was the requirement that the parties provide "more detailed evidence concerning the mediation and negotiations of the proposed settlement agreements."  (ECF No. 24 at 19.)  In accordance with the court's requirement, the parties have lodged that information with the court for *in camera* review.  After having carefully reviewed the parties' *in camera* submissions, the court finds its concerns about the parties' negotiations satisfied.  Specifically, the parties engaged in negotiations for many hours and, eventually, after multiple rounds of offers and counteroffers, the mediator made a mediator's proposal, which the parties accepted.  (ECF No. 26 at 1.)

1   Finally, as explained below, the third sign of collusion, the enhancement award

2   request, is not unreasonable and, therefore, it weighs in favor of finding no collusion.

3   In sum, it appears the settlement is a result of informed and non-collusive

4   negotiations between the parties.

5   VI.   *CY PRES* PLAN

6   The parties have designated a charity to receive any residual funds not distributed

7   through the class action settlement.  (ECF No. 26 at 6–9.)  Because most class action settlements

8   result in unclaimed funds, a plan is required for distributing those funds.  *Six Mexican Workers v.*

9   *Ariz.Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990).  The alternatives available are *cy pres*

10  distribution, escheat to the government and reversion to the defendants or the identified class

11  members.  *Id.* at 1307 n.4 ("A fourth option is the pro rata distribution of the funds to located

12  class members. . . .  We express no view as to the propriety of this distribution method." (internal

13  citation omitted)).

14  *Cy pres* distribution allows the distribution of unclaimed funds to indirectly benefit

15  the entire class.  *Id.* at 1305.  This approach requires the *cy pres* award to qualify as "the next best

16  distribution" to giving the funds directly to the class members.  *Dennis v. Kellogg Co.*, 697 F.3d

17  858, 865 (9th Cir. 2012).  "Not just any worthy charity will qualify as an appropriate *cy pres*

18  beneficiary[,]" there must be "a driving nexus between the plaintiff class and the *cy pres*

19  beneficiary."  *Id.* (quoting *Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011)).  The choice of

20  distribution options should be guided by the objective of the underlying statute and the interests

21  of the class members.  *Six Mexican Workers*, 904 F.2d at 1307.  A *cy pres* distribution is an abuse

22  of discretion if there is "no reasonable certainty" that any class member would benefit from it.

23  *Dennis*, 697 F.3d at 865 (quoting *Six Mexican Workers*, 904 F.2d at 1308).

24  Here, the proposed settlement provides that any amount remaining will be

25  distributed for *cy pres* purposes to The United Way.  Considering this action involves

26  employment issues related to compensation arising under the FLSA, the California Labor Code,

27  California Industrial Welfare Commission order provisions and the California Business and

28  Professions Code, it appears to be an appropriate plan for the unclaimed funds to be directed to a

1  charitable organization that supports members of the Bay Area and Silicon Valley community by

2  assisting them with, among other things, finding meaningful employment.  *See Lane v. Facebook,*

3  *Inc.*, 696 F.3d 811, 820–21 (9th Cir. 2012) (declining to require "that settling parties select a *cy*

4  *pres* recipient that the court or class members would find ideal.  On the contrary, such an

5  intrusion into the private parties' negotiations would be improper and disruptive to the settlement

6  process").

7          However, in preliminarily approving the parties' settlement agreement, the court

8  noted that at the final hearing, it would require counsel to address the "reasonable certainty"

9  standard set forth above.  Having carefully considered the parties' responses in their moving

10  papers and at the final approval hearing, the court finds its concerns have been addressed.  First, a

11  little more than sixty-five percent of the class members live in the Bay Area, which is served by

12  The United Way Bay Area and United Way Silicon Valley.  (ECF No. 26 at 7–8.)  Second, the

13  United Way supports projects that would benefit the class members.  The gravamen of plaintiff's

14  complaint is that the class members did not receive pay and related benefits to which they were

15  entitled under the relevant laws; the United Way provides employment and financial assistance

16  targeted to individuals for middle-skills jobs, similar to persons within the class here.  (*Id.* at 7.)

17  VII.    <u>FINAL APPROVAL OF THE CLASS SETTLEMENT IS APPROPRIATE</u>

18          In conclusion, after considering the parties' submissions and oral argument at the

19  final fairness hearing, and after considering the relevant factors, the court finds final approval of

20  the class settlement to be appropriate.  The Ninth Circuit has stated that a district court's

21  determination regarding the fairness and adequacy of a proposed settlement is ultimately "an

22  amalgam of delicate balancing, gross approximations and rough justice."  *Officers for Justice*,

23  688 F.2d at 625 (internal quotation marks omitted).  A district court must be mindful that

24  "voluntary conciliation and settlement are the preferred means of dispute resolution."  *Id.*

25  Because the court concludes that the circumstances surrounding the settlement weigh in favor of a

26  finding that the settlement is fair and adequate; because all of the preconditions to certification

27  have remained satisfied since the court preliminarily certified the settlement class; and because

28  the parties have satisfactorily addressed the court's reservations raised in its preliminary

15

1    certification order, the court GRANTS plaintiff's motion.  Accordingly, the court certifies the

2    settlement class and approves the settlement.

3    VIII.    ATTORNEY'S FEES, COSTS AND INCENTIVE AWARD

4            The class counsel seeks an award of attorney's fees in the amount of $33,333

5    (33.33% of the GSA); litigation costs in the amount of $8,004.69; and a class representative fee in

6    the amount of $5,000.  (ECF No. 25 at 3.)

7        A.    Request for Attorney's Fees

8            Rule 23 permits a court to award "reasonable attorney's fees . . . that are

9    authorized by law or by the parties' agreement."  FED. R. CIV. P. 23(h).  Even when the parties

10   have agreed on an amount, the court must award only reasonable attorney's fees in a class action

11   settlement.  *Bluetooth*, 654 F.3d at 941.  "Where a settlement produces a common fund for the

12   benefit of the entire class, courts have discretion to employ either the lodestar method or the

13   percentage-of-recovery method."  *Id.* at 942.  If the court employs the percentage-of-recovery

14   method, "calculation of the lodestar amount may be used as a cross-check to assess the

15   reasonableness of the percentage award."  *Adoma*, 913 F. Supp. 2d at 981.  While exercising

16   discretion in choosing a calculation method, the court must employ the method that will produce

17   a reasonable result.  *Bluetooth*, 654 F.3d at 942.

18           In the Ninth Circuit, the benchmark for percentage of recovery awards is 25

19   percent of the total settlement award, which may be adjusted up or down.  *Hanlon*, 150 F.3d at

20   1029; *Ross v. U.S. Nat'l Bank Ass'n*, No. 07-02951, 2010 WL 3833922, at *2 (N.D. Cal. Sep. 29,

21   2010) (stating selection of benchmark must be based on all circumstances of the case).  Factors

22   that may justify departure from the benchmark include: (1) the result obtained; (2) the risk

23   involved in the litigation; (3) the contingent nature of the fee; (4) counsel's efforts, experience,

24   and skill; and    (5) awards made in similar cases.  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043,

25   1048–50 (9th Cir. 2002).

26           "The 25% benchmark rate, although a starting point for analysis, may be

27   inappropriate in some cases.  Selection of the benchmark or any other rate must be supported by

28   findings that take into account all of the circumstances of the case."  *Id.* at 1048.  "[T]he exact

1   percentage varies depending on the facts of the case, and in most common fund cases, the award

2   exceeds that benchmark." *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 491 (E.D. Cal.

3   2010); *Williams v. Centerplate, Inc.*, No. 11-2159, 2013 WL 4525428, at *7 (S.D. Cal. Aug. 26,

4   2013) (concluding "that an award of attorneys' fees in the amount of 30% of the common fund, or

5   $195,000"); *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1377 (N.D. Cal. 1989) (noting "nearly

6   all common fund awards range around 30%").

7       Here, class counsel request an attorney's fee award higher than the benchmark

8   established by the Ninth Circuit.  Nonetheless, as explained below, the court finds the fee request

9   reasonable.  *See Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000).

10      Specifically, the award per participating class member is a favorable result

11  considering class counsel obtained a settlement early in litigation, avoiding increased costs of

12  litigation and significant uncertainties plaintiff would have faced.  *See Vasquez v. Coast Valley*

13  *Roofing, Inc.*, 266 F.R.D. 482, 492 (E.D. Cal. 2010) (result favorable where 56 employees were to

14  receive a recovery of $2,600 per employee); *see also Ching*, 2014 WL 2926210, at *7 (noting

15  "the overall result and benefit to the class from the litigation is the most critical factor in granting

16  a fee award").  In addition to the reasons discussed above, the court notes class counsel undertook

17  this case on a contingent fee basis.  ECF No. 25-1 at 1.  Courts have long recognized the public

18  policy of rewarding attorneys for accepting representation on a contingent fee basis.  *See In re*

19  *Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994) ("It is an

20  established practice in the private legal market to reward attorneys for taking the risk of non-

21  payment by paying them a premium over their normal hourly rates for winning contingency

22  cases.").  The experience of class counsel also supports a 33.33 percent award.  As noted,

23  plaintiff's counsel have extensive experience in wage and hour class action litigation.  (ECF No.

24  25-1 at 15.)  Finally, the absence of objections from the class further demonstrates the

25  reasonableness and fairness of the attorney's fee request.  *See In re Heritage Bond Litig.*, No. 02-

26  1475, 2005 WL 1594389, at *17–18 (C.D. Cal. June 10, 2005); *see also Garner v. State Farm*

27  *Mut. Auto. Ins. Co.*, No. 08- 1365, 2010 WL 1687829, at *2 (N.D. Cal. Apr. 22, 2010) (noting

28  /////

1   "single objection out of a sizeable class, after notice, further demonstrates the reasonableness and

2   fairness of [c]lass [c]ounsels' request").

3            Comparison with the lodestar method also supports awarding the 33.33 percent

4   request.  As noted above, in cases where courts apply the percentage method to calculate

5   attorney's fees, courts are encouraged to use a calculation of the lodestar as cross-check to

6   evaluate the reasonableness of the percentage award.  *See Bluetooth*, 654 F.3d at 943.  In

7   calculating an attorney's fees award under this method, a court must start by determining how

8   many hours were reasonably expended on the litigation, and then multiply those hours by the

9   prevailing local rate for an attorney of the skill required to perform the litigation.  *Moreno v. City*

10  *of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008).  When a court uses the lodestar as a cross-

11  check to a percentage claim of fees, it need only make a "rough calculation."  *Schiller v. David's*

12  *Bridal, Inc.*, No. 10-00616, 2012 WL 2117001, at *22 (E.D. Cal. June 11, 2012).

13           In granting plaintiff's motion for a preliminary approval, the court directed class

14  counsel to provide the court with detailed information to permit the court to perform a lodestar

15  cross-check.  The class counsel submitted that information along with their motion for an award

16  of attorney's fees.  (ECF Nos. 25, 25-1, 25-2, 25-3, 25-4.)  The class counsel represent that their

17  lodestar amount is $90,479.17.  (ECF No. 25-1 at 18.)  To reach that amount, the class counsel

18  used the rate of $650 per hour for Mr. Spivak (60 hours), an attorney with nineteen years'

19  experience; $250 per hour for Ms. Tahmassian (83.40 hours), a second year attorney; $250 per

20  hour for Ms. Treystman (51.40 hours), a second-year attorney; $250 per hour for Mr. Nguyen (10

21  hours), a second-year attorney; $175 per hour for Mr. Oyama (53.50), a paralegal of six years;

22  $150 per hour (5.40 hours), a second-year paralegal; and $625 per hour for Mr. Haines (7.30

23  hours), an attorney with thirty-seven years' experience.  (*Id.*)  Having reviewed the class

24  counsel's billing records, the court finds them reasonable.  Among other things, the case involved

25  investigation; the filing of a fairly complex complaint; some pre-trial filings; and the subsequent

26  settlement after a mediation session, which in turn required the filing of a motion for preliminary

27  approval and final approval.

28  /////

1    The court GRANTS plaintiff's request for attorney's fees in the amount of

2  $33,333.

3    B.    Request for Costs

4    The court must determine an appropriate award of costs and expenses.  FED. R.

5  CIV. P. 23(h).  "[I]n evaluating the reasonableness of costs, 'the judge has to step in and play

6  surrogate client.'"  *In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act*

7  *(FACTA) Litig.*, 295 F.R.D. 438, 469 (quoting *In re Cont'l Ill. Secs. Litig.*, 962 F.2d 566, 572 (7th

8  Cir. 1992)).  "In keeping with this role, the court must examine prevailing rates and practices in

9  the legal marketplace to assess the reasonableness of the costs sought."  *Id.* (citing *Missouri v.*

10  *Jenkins*, 491 U.S. 274, 286–87 (1989)).

11    Here, the class counsel states the total amount of costs is $8,004.69.  (ECF No. 25-

12  1 at 18.)  The expenses include, among other things, costs for copying, filing, postage,

13  transportation, service of process, and lodging.  (ECF No. 30-1, Ex. 4.)  The largest expense is the

14  mediation fee in the amount of $5,000.  Courts routinely approve reimbursement of such costs.

15  *See, e.g.*, *FACTA*, 295 F.R.D. at 469 ("Expenses such as reimbursement for travel, meals,

16  lodging, photocopying, long-distance telephone calls, computer legal research, postage, courier

17  service, mediation, exhibits, documents scanning, and visual equipment are typically

18  recoverable." (internal quotation marks omitted)); *see also Pierce v. Rosetta Stone, Ltd.*, No. 11-

19  01283, 2013 WL 5402120, at *6 (N.D. Cal. Sept. 26, 2013) (reimbursing mediation fees).  After

20  reviewing the expenses the class counsel seek, the court finds them quite modest and therefore

21  reasonable.

22    Accordingly, the court GRANTS plaintiff's request for reimbursement of costs in

23  the amount of $8,004.69.

24    C.    Incentive Award

25    A district court has discretion to grant an incentive award to a named plaintiff to

26  compensate for risks taken and work done on behalf of the class.  *See Staton v. Boeing Co.*, 327

27  F.3d 938, 976–78 (9th Cir. 2003).  Such awards are fairly typical in class action cases.

28  /////

*Rodriguez*, 563 F.3d at 958.  In determining whether to approve an incentive award, courts may consider the following factors:

> (1) the risk to the class representative in commencing suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation[;] and[] (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.

*Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995).

Here, with respect to the first factor, the risk in commencing the suit, plaintiff avers that by initiating the instant case she shouldered some degree of personal risk, including financial liability if defendant prevailed and reduced future employment prospects in plaintiff's field of work.  (ECF No. 25-4 ¶¶ 10–11.)  Those risks are relevant factors in evaluating an incentive award request.  *See Staton*, 327 F.3d at 977.  Hence, the first factor weighs in favor of granting an incentive award to plaintiff.

With respect to the second factor, the notoriety and difficulties encountered, plaintiff avers she shouldered many responsibilities.  (ECF No. 25-4 ¶ 8.)  While that may be true, nothing in the record suggests particular notoriety associated with the instant litigation.  Hence, this factor is neutral.

With respect to the third factor, the amount of time and effort spent, plaintiff states she spent over fifty hours assisting class counsel with the litigation of the case.  (*Id.* ¶ 9.)  Her activities included, among other things, obtaining legal counsel and communicating with her legal counsel on numerous occasions, assisting them in gathering information, "identifying the claims brought in this case . . . [and] participating in a full day mediation . . . ."  (*Id.*)  Because plaintiff expended reasonable efforts and was involved in the mediation, this factor weighs in favor of granting an incentive award to plaintiff.  *See FACTA*, 295 F.R.D. at 471.

With respect to the fourth factor, the duration of the litigation, the litigation of this case was not protracted: the case was initiated in February 2013 in San Joaquin County Superior Court (ECF No. 1), removed to this court in April 2013 (*id.*), and settled as a result of a mediation session held in January 2014 (ECF No. 18).  Given the length of the litigation, the court finds the

20

1    fourth factor neutral.  *Cf. Van Vranken*, 901 F. Supp. at 299 (where the class representative's

2    "participation lasted through many years of litigation[,]" an incentive award was appropriate).

3                 Next, with respect to the fifth factor, the personal benefit enjoyed by plaintiff,

4    plaintiff has "given up the right to pursue individual claims for unpaid wages, unpaid mileage

5    expenses, unpaid meal and rest period premium wages, interest, waiting time penalties, pay stub

6    penalties, and civil penalties."  (ECF No. 25-4 ¶ 7.)  Under the class settlement agreement,

7    plaintiff will not gain any benefit beyond that she would gain as one of the class members.  *See*

8    *FACTA*, 295 F.R.D. at 472 ("An incentive award may be appropriate when a class representative

9    will not gain any benefit beyond that he would receive as an ordinary class member.").  This

10   factor weighs in favor of granting an incentive award to plaintiff.

11                Finally, the class representative has also addressed the court's request for a

12   detailed declaration describing the "specific activities she performed . . . and the amount of time

13   she spent on each activity."  (ECF No. 24 at 19.)  Specifically, plaintiff has submitted a

14   spreadsheet reflecting the tasks she performed, ranging from assembling documents to attending

15   the mediation session, and the number of hours she spent on this case, a total of 52.75.  (ECF No.

16   25-4, Ex. 1.)

17                In sum, after considering the relevant factors, the court finds that an incentive

18   award of $5,000 for plaintiff is justified under the circumstances.  *See, e.g.*, *In re Mego Fin. Corp.*

19   *Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000) (approving a $5,000 incentive award); *Ching*, 2014

20   WL 2926210, at *9 (approving a $5,000 incentive award and noting that in the Northern District,

21   "a $5,000 incentive award is presumptively reasonable"); *see also FACTA*, 295 F.R.D. at 470

22   (approving a $5,000 incentive award).

23   /////

24   /////

25   /////

26   /////

27   /////

28   /////

21

IX.     CLAIMS ADMINISTRATOR FEE

         Plaintiff also requests the court approve administrative costs in the amount of $5,000 to be paid to the third-party claims administrator.  (ECF No. 28-1 at 8.)  The claims administrator breaks down that amount as follows:

**Notification**

| | |
|---|---:|
| Case Setup | $   270.00 |
| Mailing Database Preparation | 1,446.25 |
| Software Customization | 437.50 |
| Document Formatting | 738.75 |
| Case Management | 1,952.50 |
| NCOA[2] | 250.00 |
| Print Production | 90.00 |
| Printing | 379.28 |
| Postage | 42.24 |
| RUM[3] Scanning | 2.25 |
| RUM Searches – 9 @ $1.50 | 13.50 |
| Remails – 8 @ $4.56 | 36.48 |
| Staff Hours Performing RUM & Remails Services | 90.00 |
| Phone Script and FAQ Development | 450.00 |
| Staff Hours Telephone Support | 656.25 |

| | |
|---|---|
| Subtotal Notification | $ 6,855.00 |

**Processing and Reporting**

| | |
|---|---:|
| Claims Processing | $   280.00 |
| Dispute Processing | 70.00 |
| Staff Hours for General Claimant Correspondence | 270.00 |
| Staff Hours Handling Address Updates | 270.00 |

**Processing and Reporting continued**

| | |
|---|---:|
| Declaration of Notice Procedures | 720.00 |
| Weekly Reporting | 720.00 |

| | |
|---|---|
| Subtotal Reporting | 2,330.00 |

/////

---

[2]  NCOA is an acronym for national change of address.  (ECF No. 28-1 at 3.)

[3]  RUM is an acronym for returned undeliverable mail.  (ECF No. 28-2, Ex. D.)

22

**Distribution**

| | |
|---|---:|
| Settlement Fund Setup & Management | $ 450.00 |
| Name/TIN Mismatch Service | 270.00 |
| Distribution Calculation | 450.00 |
| Distribution Preparation | 450.00 |
| Check Issuance – 88 @ $2.00 | 176.00 |
| W-2 Filing Fee | 350.00 |
| W-2 Issuance – 88 @ $0.75 | 66.00 |
| 1099 Filing Fee | 350.00 |
| 1099-INT Issuance – 27 @ $0.50 | 13.50 |
| 1099-MISC Issuance – 27 @ $0.50 | 13.50 |
| Postage | 43.12 |
| Reissue Request Fulfillment | 5.50 |
| Staff Hours Handling Check Follow-up & Reissues | 90.00 |
| Tax Compliance – 1 yr | 2,500.00 |
| Final Accounting | 720.00 |

| | |
|---|---:|
| Subtotal Distribution | 5,947.62 |
| THIS INVOICE | 15,132.62 |
| LESS DISCOUNT | < 10,132.62> |
| AMOUNT DUE | $ 5,000.00 |

(ECF No. 28-3, Ex. B.)

This request is reasonable in light of the claims administrator's responsibilities before and after the final approval hearing. *See Ching*, 2014 WL 2926210, at *2 (approving an estimated $15,000 claims administrator fee for 68 claims); *Ozga v. U.S. Remodelers, Inc.*, No. 09-05112, 2010 WL 3186971, at *2 (N.D. Cal. Aug. 9, 2010) (granting $10,000 to the claims administrator for 156 claims); *Stuart v. Radioshack Corp.*, No. 07-4499, 2010 WL 3155645, at *7 (N.D. Cal. Aug. 9, 2010) (granting reasonable costs for, among other things, mailing the notice, receiving claims, and resolving disputed claims). Accordingly, the court approves the claims administrator fee in the amount of $5,000.

/////

/////

/////

X.    <u>CONCLUSION</u>

For the foregoing reasons, the court orders as follows:

1.  The court GRANTS final approval of the settlement.

2.  The court AWARDS the class counsel attorney's fees in the amount of $33,333.

3.  The court AWARDS the class counsel reimbursement of expenses in the amount of $8,004.69

4.  The court AWARDS an incentive payment of $5,000 to the class representative, Tysheika Ogbuehi.

5.  The court AWARDS administration costs in the amount of $5,000 to the claims administrator Gilardi & Co. LLC.

6.  The parties and the settlement administrator shall perform their respective obligations under the terms of the settlement agreement.

7.  The court enters JUDGMENT and CLOSES the case.

8.  The court in its discretion DECLINES to maintain jurisdiction to enforce the terms of the parties' settlement agreement.

9.  This order resolves ECF Nos. 25 and 28.

IT IS SO ORDERED.

DATED:  June 8, 2015.

_____
UNITED STATES DISTRICT JUDGE

24